

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

## NO. WR-45,746-02

**Ex parte DAVID WOOD, Applicant**

### ON APPLICATION FOR A WRIT OF HABEAS CORPUS
### IN CAUSE NO. 58486-171-2 IN THE 171ST DISTRICT COURT
### EL PASO COUNTY

KELLER, P.J., delivered the opinion of the Court in which KEASLER, HERVEY, YEARY, NEWELL and KEEL, JJ., joined. NEWELL, J., filed a concurring opinion in which KELLER, P.J., and HERVEY and KEEL, JJ., joined. ALCALA, J., filed a dissenting opinion. WALKER, J., dissented. RICHARDSON, J., did not participate.

Applicant filed a subsequent application claiming that he was exempt from the death penalty due to intellectual disability[1] and that due process required that he be given tools and a hearing to more fully establish his intellectual-disability claim. We remanded the case for the habeas court to consider these claims.[2] Upon receiving the case back from the habeas court, we considered

---

[1] *See Atkins v. Virginia*, 526 U.S. 304 (2002).

[2] *Ex parte Wood*, No. WR-45,746-02, 2009 Tex. Crim. App. Unpub. LEXIS 841 (Tex. Crim. App. August 19, 2009) (not designated for publication).

Applicant's allegations and denied relief upon the habeas court's findings and our own review.[3]

After the Supreme Court's decision in *Moore v. Texas,*[4] Applicant filed a suggestion that we reconsider his application on our own initiative. Having reviewed the record in this case in light of *Moore v. Texas* and our own subsequent decision of *Ex parte Moore*,[5] we conclude that no further record development or fact findings are needed and that Applicant is not entitled to relief.

The habeas court's findings of fact were extensive. Some of those findings, 280 through 322, discussed the *Briseno*[6] factors and possible alternate causes of any adaptive deficits and are no longer viable after the *Moore* cases.[7] Nevertheless, the habeas court's denial of relief remains amply supported by findings 1 through 279. We further explain our reasoning below.

### IQ Tests

In findings 1 through 73, the habeas court discussed Applicant's IQ tests. His IQ scores ranged from 64 to 111. However, the only test that the habeas court could conclude was comprehensive and conducted properly was the one conducted by Dr. Thomas Allen in 2011. This

---

[3] *Ex parte Wood*, No. WR-45,746-02, 2014 Tex. Crim. App. Unpub. LEXIS 1055 (Tex. Crim. App. November 26, 2009) (not designated for publication).

[4] 137 S. Ct. 1039 (2017).

[5] 548 S.W.3d 552 (Tex. Crim. App. 2018).

[6] *Ex parte Briseno*, 135 S.W.3d 1 (Tex. Crim. App. 2004).

[7] Findings 280-322 may well contain some observations that are relevant to the issue of intellectual disability, but we need not address whether any portion of them may be salvaged because the habeas court's denial of relief remains amply supported even without all of them.

test yielded a full scale IQ score of 75,[8] with a measurement error range of 71 to 80 (-4, +5).[9]

Because the low end of the error range is above 70, Applicant's score does not meet the first prong

of the DSM-5 test for intellectual disability (deficits in general mental abilities).[10]

### Malingering

Moreover, the habeas court believed Dr. Allen's testimony that the validity of Applicant's

score of 75 was in question due to strong evidence that Applicant exerted poor effort during the

tests.[11] This belief was supported by the results of two tests for malingering—results that were not

even close to what would be expected to show adequate effort on the tests. This poor effort could

affect IQ scores by as much as a standard deviation (fifteen points) or more.[12] Applicant's writing

and vocabulary in various letters also appeared to be at odds with his low test scores.[13] The habeas

court found that Applicant was malingering during the test conducted by Dr. Allen and that the IQ

---

[8] The verbal comprehension score was 80 and the perceptual reasoning score was 86.

[9] *See* Finding 35. Dr. Allen testified that the standard measurement error is not automatically plus or minus five. He explained that the standard measurement error is "calculated for you in the manual" and depends on statistics.

[10] *See Moore*, 548 S.W.3d at 560 ("A score is indicative of intellectual disability if it is 'approximately two standard deviations or more below the population mean, including a margin for measurement error (*generally* +5 points).' When the standard deviation of the test is 15 and the mean is 100, a score that is two standard deviations below the mean will be "a score of 65–75 (70 ±5).") (emphasis added). *See also* Finding 35.

[11] *See* Findings 40-60.

[12] *See* Finding 37. Dr. Allen testified that it would be inappropriate to add 15 points to an IQ score to account for lack of effort in the testing, but he considered this lack of effort and its possible effect to be a legitimate concern regarding the validity of Applicant's score of 75. We likewise decline to add points to an IQ score due to lack of effort but consider it as undermining the validity of the score as an indicator of intellectual disability.

[13] *See* Findings 61-68.

score of 75 under-reports Applicant's true intelligence.[14]

Because the only test with any validity yielded an IQ score that, even accounting for standard measurement error, is not within the range for intellectually disabled persons and because even that score appears to understate Applicant's intelligence due to the strong evidence of malingering, Applicant has failed the first prong of the intellectual-disability framework, and there is no need to conduct an adaptive-deficits inquiry.[15] But even if we were required to engage in such an inquiry, the habeas court's findings make clear that Applicant also fails to show the requisite adaptive deficits.

## Adaptive Deficits

In findings 102 through 279,[16] the habeas court comprehensively discussed Applicant's adaptive functioning. The habeas court concluded that the record fails to support the existence of adaptive deficits in the areas of functional academics,[17] communication,[18] self-care,[19] home living

---

[14] *See* Finding 70.

[15] *Cf. Moore*, 548 U.S. at 562 ("Because the score of 74 is within the test's standard error of measurement for intellectual disability (being within five points of 70), we must assess adaptive functioning before arriving at a conclusion regarding whether Applicant is intellectually disabled.").

[16] Findings 74 through 101 discussed and rejected application of the "Flynn effect," both as a general matter and—even assuming its general validity—as applied to Applicant's case.

[17] Findings 153-68.

[18] Findings 169-89.

[19] Findings 190-95.

and money management,[20] social and interpersonal skills,[21] use of community resources,[22] self-direction,[23] work,[24] leisure activities,[25] and health and safety.[26] The habeas court also explained specifically why the testimony of Applicant's witnesses—a fourth grade teacher, a childhood friend, and Applicant's sister—failed to support a conclusion that Applicant suffered from adaptive deficits.[27] On this record and under the habeas court's findings, Applicant has failed to show adaptive deficits indicative of intellectual disability.

### Remand for a New Hearing or Findings

Sometimes we allow an applicant to put on new evidence on remand when there was no reason or opportunity to put on the relevant evidence earlier. There is no reason to allow Applicant to put on new evidence. The *Moore* decisions changed the legal analysis for reviewing intellectual-disability claims in Texas, but Applicant's evidence relating to intellectual disability is already in the record. Applicant had plenty of incentive during the proceedings associated with his second habeas application to present all available witnesses to support his intellectual-disability claim. As the habeas court pointed out, Applicant's defense team was given funds to hire an expert witness but

---

[20] Findings 196-207.

[21] Findings 208-26.

[22] Findings 227-29.

[23] Findings 230-42.

[24] Findings 243-64.

[25] Findings 265-72.

[26] Findings 273-79.

[27] Findings 105-52.

failed to offer expert testimony at the habeas hearing.[28] Even now, in his suggestion that the Court grant rehearing on its own initiative, Applicant does not contend that he should be given the opportunity to submit new evidence. A remand to allow the opportunity to further develop the evidence is simply unwarranted.

Nor is a remand warranted for additional findings of fact. Striking findings 280 through 322 would bring the habeas court's findings in compliance with the *Moore* decisions, and given the extensive nature of the fact finding contained in findings 1 through 279, there is no reasonable likelihood that the habeas court's recommendation to deny relief would change, nor would there be any support for such a change in light of those findings.

### Conclusion

We grant reconsideration on our own initiative to consider Applicant's case in light of *Moore v. Texas* and *Ex parte Moore*.[29] We adopt findings 1 through 279, reject findings 280 through 322, and deny relief.

Delivered: December 12, 2018

Publish

---

[28] Finding 5 ("Additionally, although Applicant was provided with funds for an expert, and actually used those funds, he did not call his own expert. Instead, Applicant attempted to impeach the State's expert, Dr. Allen, and develop his claim thorough Allen's examination of Applicant. Dr. Allen agreed with very little, if any of Applicant's assertions.").

[29] *See supra* at nn.4-5.