

# In the Court of Criminal Appeals of Texas

No. WR-70,963-02

EX PARTE JUAN RAMON MEZA SEGUNDO,

*Applicant*

On Application for a Writ of Habeas Corpus
Cause No. C-3-W011370-0974988-B
In Criminal District Court No. Three
From Tarrant County

YEARY, J., filed a dissenting opinion.

In this case, Applicant has filed a subsequent application for writ of habeas corpus seeking relief from a judgment in a capital murder case in which the death penalty was imposed. TEX. CODE CRIM. PROC. art. 11.071 § 1. Because it is a subsequent application, it is brought under Article 11.071, Section 5(a)(1), of the Texas Code of Criminal Procedure,

and it is predicated on an argument that the legal basis for his current claim was unavailable on the date the applicant filed his initial application. TEX. CODE CRIM. PROC. art. 11.071 § 5(a)(1).

Today the Court excuses Applicant from execution on the basis that he is intellectually disabled. The United States Supreme Court has said that the Eighth Amendment to the United States Constitution places a substantive restriction on the State's power to take the life of a person with intellectual disability (née mental retardation; hereafter, "ID"), no matter how heinous his offense may be. *Atkins v. Virginia*, 536 U.S. 304 (2002). There are several reasons I find myself compelled to dissent to the Court's order, a few of which I will catalogue here.

## I.       Background

Applicant was tried, convicted, and sentenced to death in December of 2006, some four and a half years after *Atkins* was decided. At the guilt phase of his trial, evidence was adduced showing that, in 1986, Applicant broke into a small home in northwest Fort Worth, where he raped and then strangled to death an 11-year-old girl named Vanessa Villa. He was not immediately caught. Instead, Vanessa's rape and murder remained unsolved until 2005, when a routine database check revealed that Applicant's DNA profile "matched" the profile of semen found inside Vanessa's vagina after her death. Additional evidence at both the guilt and punishment phases of trial revealed that, before he was apprehended, Applicant had similarly raped and killed two women, in 1994 and 1995; that he sexually assaulted and choked two other women in 1987 and 1990; and that he molested his girlfriend's five-year-old daughter "in the late 1980's." *Segundo v. State*, 270 S.W.3d 79, 83–

84 (Tex. Crim. App. 2008).

Applicant's previous attempts to raise ID have not met with success. His trial lawyers' own experts seem to have concluded that he did not meet the diagnostic criteria for ID. But they nevertheless asked for an *Atkins* instruction at the conclusion of the punishment phase of his trial. When the trial court denied this request, Applicant did not even challenge that ruling on direct appeal to this Court. *Segundo v. State*, 270 S.W.3d 79 (Tex. Crim. App. 2008).

Applicant *did* renew his ID claim in his initial post-conviction application for writ of habeas corpus, which was filed under Article 11.071 of the Code of Criminal Procedure, in 2008. But this Court denied that claim in 2010, after he was afforded a full and fair opportunity to air it. Once again, Applicant's own expert concluded that he was *not* intellectually disabled under the *then-relevant* diagnostic criteria. *Ex parte Segundo*, No. WR-70,963-01, 2010 WL 4978402 (Tex. Crim. App. Dec. 8, 2010) (not designated for publication).

Now, for a third time, Applicant is given a chance to present his ID claim, in a subsequent post-conviction application for writ of habeas corpus. *Ex parte Segundo*, No. WR-70,963-02 (Tex. Crim. App. Oct. 31, 2018) (not designated for publication) (remanding subsequent writ application under Article 11.071, Section 5, in light of the opinion of the United States Supreme Court in *Moore v. Texas*, 137 S. Ct. 1039 (2017), to allow him once again to pursue his ID claim). This Court stayed an execution date to allow him to pursue this claim. *See Ex parte Segundo*, No. WR-70,963-02, 2018 WL 4856580 (Tex. Crim. App. Oct. 5, 2018) (not designated for publication) (ordering stay); *Ex parte Segundo*, No. WR-

70,963-02 (Tex. Crim. App. Oct. 31, 2018) (not designated for publication) (remanding subsequent writ application under Article 11.071, Section 5, in light of the opinion of the United States Supreme Court in *Moore v. Texas*, 137 S. Ct. 1039 (2017), to allow him once again to pursue his ID claim). I guess the third time is a charm: The Court concludes that Applicant has finally managed to prove his ID claim, and it vacates his death sentence and consigns him to a sentence of life in the penitentiary (in Applicant's case, *with the possibility of parole*, since his offense occurred so long ago—it predates the imposition of mandatory life without parole as the only alternative to the death penalty for capital offenders not sentenced to death).

## II.     Proper Forum for ID Determination?

First of all, given the procedural history, I am not at all certain that this Court should be the one—if any—to make the determination whether Applicant fits the diagnostic criteria for ID in the first instance. The claim has already been fully litigated in the trial court, albeit unsuccessfully. If there is some reason to question the legitimacy of the trial-level resolution of Applicant's ID claim, then it is at least arguable that the case should be returned to the trial court for another determination of whether he is intellectually disabled, in *that* forum, subject only to this Court's deferential review on appeal.

As I have recently argued in similar contexts, this Court should not exercise its role of "ultimate fact-finder" to grant relief in post-conviction habeas proceedings without first deciding the propriety of doing so. *See Ex parte Lizcano*, 607 S.W.3d 339, 340–41 (Tex. Crim. App. 2020) (Yeary, J., dissenting) (because the issue of intellectual disability

was initially litigated in the trial court, asking: "May this Court simply re-visit the ID issue *sua sponte* and make a merits determination *de novo*? Or is the proper disposition, instead, to remand the case to the convicting court for, if not an altogether new punishment hearing before a jury, at least another jury determination of the ID issue?"); *Ex parte Williams*, No. WR-71,296-03, 2020 WL 7234532 (Tex. Crim. App. Dec. 9, 2020) (Yeary, J., dissenting) (not designated for publication) (same). Because the Court continues to grant relief on these claims of ID while skirting this issue, I once again respectfully dissent.

## III.    Evolved Professional Diagnostic Standards Not Shown to Reflect Society's Standards

There is a second, more fundamental reason I disagree with the Court's summary disposition in this case. On this third go-round, all of the mental health experts—including Applicant's expert from his initial writ application—for the first time rely upon only the *most recent* diagnostic manuals for ascertaining ID: (1) the APA, Diagnostic and Statistical Manual of Mental Disorders (5th ed. 2013) (hereinafter, "DSM-5"), and (2) the American Association on Intellectual and Developmental Disabilities (11th ed. 2010) (hereinafter, "AAIDD–11"). Neither of these current manuals represents the precise state of the diagnostic criteria for ID as it existed in 2002, when *Atkins* was decided. *See Atkins*, 536 U.S. at 308 n.3 (describing "mental retardation" consistent with the diagnostic criteria contained in the American Association of Mental Retardation's manual, Mental Retardation: Definition, Classification, and Systems of Support (9th ed. 1992) (hereinafter, "AAMR-9th ed."); and the text revision of the Diagnostic

and Statistical Manual of Mental Disorders (4th ed. 2000) (hereinafter "DSM-IV-TR")). Nor do they represent the diagnostic criteria that were in place when Applicant was evaluated for ID for purposes of his trial, in 2006, and again for purposes of his initial writ application, in 2009.[1] In fact, Applicant's expert during the initial habeas proceedings—forensic psychologist Dr. Stephen A. Thorne—has only changed his mind now because of the shift in diagnostic criteria in the newest manuals, having previously concluded, based upon their predecessors, that Applicant was *not* intellectually disabled.

But, as Justice Alito has observed, "[u]nder our modern Eighth Amendment cases, what counts are our society's standards—which is to say, the standards of the American people—not the standards of professional associations, which at best represent the views of a small professional elite." *Hall v. Florida*, 572 U.S. 701, 731 (2014) (Alito, J., dissenting). As Chief Justice Roberts has similarly remarked, "this Court's precedents . . . establish[] that the determination of what is cruel and unusual rests on a judicial judgment about societal standards of decency, not a medical assessment of clinical practice." *Moore v. Texas*, 137 S. Ct. 1039, 1057–58 (2017) (Roberts, C.J., dissenting). Indeed, in determining the extent to which Eighth Amendment "standards of decency" may have "evolved," the Supreme Court has consistently "looked not to our own conceptions of decency, but to those of modern American society as a whole." *Stanford v. Kentucky*, 492 U.S. 361, 369 (1989). At most, *Atkins* may be said to have prohibited the death penalty

---

[1] By 2006, the 10th edition of the AAMR had come out. But the AAIDD-11th ed. did not come out until 2010, and the DSM-5 did not come out until 2013.

for those who were "mentally retarded" based upon a national consensus about what society believed that meant *in 2002*. To the extent that the mental health community has evolved its definition of ID since that time, we have no assurances that society's standards of decency have also evolved to the same extent.

At the hearing on Applicant's initial writ application, conducted in 2009, Dr. Thorne testified that Applicant met none of the three prongs to establish ID under the DSM-IV-TR, which was the diagnostic manual in effect at that time: (1) significant subaverage general intellectual functioning, (2) significant adaptive deficits, and (3) onset before age eighteen.[2] With respect to the first criteria, Dr. Thorne observed that Applicant had been administered the Wechsler Adult Intelligence Scale–Third Edition (WAIS-III) in 2006, by an expert for Applicant's trial attorneys named Dr. Kelly Goodness. Applicant achieved a composite IQ score of 75 at that time. Dr. Thorne also noted, however, that there was a "significant difference" between Applicant's verbal IQ sub-score (70) and his performance IQ sub-score (85) on the WAIS-III, and that "in some ways that 85, given [Applicant's] background, is probably a more accurate reflection of his true intellectual ability."

Dr. Thorne himself administered the Wechsler Adult Intelligence Scale–Fourth Edition (WAIS-IV) in 2009, obtaining a composite IQ score for Applicant of 72. Although he explained that the WAIS–IV "doesn't actually break down the score into verbal and non-verbal anymore like

---

[2] *See* DSM-IV-TR at 41 ("The essential feature of Mental Retardation is significantly subaverage general intellectual functioning . . . that is accompanied by significant limitations in adaptive functioning . . . [and] onset must occur before age 18 years[.]").

the WAIS-III did[,]" he noted that Applicant still scored significantly lower on the verbal subtests, "where his lowest scores [on the WAIS-IV] came from." Dr. Thorne suspected that the higher performance scores on both the WAIS-III and WAIS-IV more accurately reflected Applicant's true level of general intellectual functioning. This impression was reinforced by the fact that, from records and his clinical evaluation of Applicant, Dr. Thorne saw no adaptive deficits, much less onset before 18.

The DSM-IV-TR, which was the manual in circulation at the time of Dr. Thorne's 2009 evaluation of Applicant, contains the following statement about "scatter in subtest scores":

> When there is significant scatter in the subtest scores, the profile of strengths and weaknesses, rather than the mathematically derived full-scale IQ, will more accurately reflect the person's learning abilities. When there is a marked discrepancy across verbal and performance scores, averaging to obtain a full-scale IQ score can be misleading.

DSM-IV-TR at 42. Without going into the same level of detail, the DSM-5 also nevertheless makes the consistent observation that "highly discrepant individual subtest scores may make an overall IQ score invalid." DSM-5 at 37. These precatory observations—particularly from the DSM-IV-TR—would seem to support Dr. Thorne's conclusion, during the initial writ proceedings in 2009, that Applicant did not, in fact, suffer from ID.

Nevertheless, in his affidavit in support of Applicant's current subsequent writ application, Dr. Thorne has explained why, in view of the current manuals, he has now changed his mind about (what would now be called, in the DSM-5, at 37) Applicant's "deficits in general

mental abilities":

> While it remains my opinion that the observed discrepancy (across IQ measures) in verbal and non-verbal abilities is relevant for consideration, it should also be emphasized that guidelines (published after this examiner's 2009 evaluation of [Applicant]) set forth in the AAIDD Manual (2010) do explicitly state that essential to the application of the definition of Intellectual Disability is an assumption that "within an individual, limitations often coexist with strengths". Such definitional guidance, when combined with relevant DSM-5 criteria deemphasizing the role of IQ scores in the assessment/diagnosis of intellectual disability (DSM-5 criteria does not, in fact, reference a specific IQ benchmark, nor does it include the aforementioned language about "scatter" among subtest scores or verbal/non-verbal discrepancies), has contributed to clinicians placing greater emphasis on an individual's "global" IQ score (as opposed to focusing on strengths that may be reflected in the aforementioned discrepancy between an individual's verbal and non-verbal abilities).

Without going into the same level of detail, Dr. Thorne has also now said that *the current diagnostic framework* for assessing "impairment in everyday adaptive functioning" (DSM-5 at 37) has led him to "no longer [be] confident" in his previous conclusion that Applicant does not suffer from adaptive deficits under of the second prong of the standard for ID.

With respect to adaptive deficits, the State's current expert, neuropsychologist Dr. Matthew A. Clem, has concluded—again, under the current diagnostic criteria as reflected in the latest manuals—that Applicant satisfies the second prong of the standard for ID, in that he has shown adaptive limitations at least in the "conceptual" domain, if

not the other two.[3] Dr. Clem makes it clear, however, that he would not likely have concluded the same under the old diagnostic regime:

> It is currently my opinion that the presence of significant deficits in the conceptual domain is supported. While [Applicant's] deficits in this area previously may not have been considered as rising to the significant level, this has changed in light of the current state of the diagnostic nomenclature, research, and case law pertaining to intellectual disability. * * * Taken in total, his functional academic abilities would have been previously viewed as representing a deficit, but not at the significant level. This is due in part to consideration of his low level of education (he left school in the 8th grade). In other words, his deficits in functional academics would have been viewed as at least partially attributable to his lack of education rather than being fully explained by intellectual deficiency, with the expectation that his functional academic abilities would have been better had he benefitted from a more typical education. In the current conceptualization of intellectual disability, however, a lack of education is not viewed as a differential consideration regarding intellectual disability, but rather as one of many potential risk factors for such. In other words, Mr. Segundo's lack of education is currently conceptualized as having placed him at increased risk for intellectual disability rather than being viewed as a potential alternate explanation for his deficits.

Thus, by all appearances, the latest expert assessment that Applicant

---

[3] Under the last manual, the DSM-IV-TR, at 41, in order to find significant limitations in adaptive functioning, a diagnostician would have to find deficits in at least two of the following eleven domains: "communications, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety." The DSM-5 has altered this scheme so that it is now necessary to find deficits in at least one of three domains: "conceptual (academic)," "social," and "practical." DSM-5 at 37–38.

indeed suffers from ID is almost wholly contingent on diagnostic criteria that were not previously accepted—at least not definitively—by the relevant mental health community.

The presumption that underlies the Court's summary grant of relief today seems to be that what constitutes ID is a static thing; that the current manuals identify threshold criteria for ID and comprise the substantive benchmark for determining the scope of *Atkins*'s Eighth Amendment prohibition. Moreover, the presumption continues, any new developments in the diagnostic criteria merely signal a new way to describe a condition that society already agrees insulates its sufferer from capital punishment.[4] But when the diagnostic criteria outlined in the manuals are revised so drastically and pervasively that what it even means to be intellectually disabled has substantively *changed*, that only

---

[4] It is true that, in *Moore*, the Supreme Court observed:

"[E]ven within Texas' criminal-justice system, the State requires the intellectual disability diagnosis of juveniles to be based on 'the latest edition of the DSM.' 37 Tex. Admin. Code § 380.8751(e)(3) (2016). Texas cannot satisfactorily explain why it applies current medical standards for diagnosing intellectual disability in other contexts, but clings to superseded standards when an individual's life is at stake."

137 S. Ct. at 1052. The suggestion seems to be that the statutory scheme itself automatically adopts the latest professional assessment of what it means to be ID, and that the "objective indicia" of society's attitude about executing intellectually disabled offenders evolves right along with the professional assessment adopted under that flexible statutory scheme. *Id.* But this argument completely removes the "objective" from "objective indicia." Such a statutory scheme is wholly predictive; it no longer necessarily *describes* the attitude of society, but prospectively *prescribes* it. I fail to understand how such a scheme any longer reflects the current consensus of *society*.

means that the *mental health experts'* understanding of the condition has evolved. It provides us no assurance that the broader society's tolerance for the death penalty—the *nation's* consensus—has evolved concomitantly. The burden on a post-conviction habeas applicant to present "objective indicia" of society's intolerance is a "heavy" one. *Stanford v. Kentucky*, 492 U.S. at 373. Applicant has not satisfied it here.

## IV. Serial Litigation of ID?

The Court has also authorized Applicant to proceed under Section 11.071, Subsection 5(a)(1), which prohibits granting relief in a subsequent writ application unless the applicant can show, among other things, that a new legal basis for relief has become available since he filed his initial writ application. TEX. CODE CRIM. PROC. art. 11.071, § 5(a)(1). The new law Applicant relied upon was the Supreme Court's 2017 opinion in *Moore*. But, as far as I can tell, when Dr. Thorne concluded in 2009, for purposes of Applicant's initial writ proceedings, that Applicant was *not* intellectually disabled, he made none of the mistakes that the Supreme Court faulted this Court for making in *Moore*.[5]

---

[5] Dr. Thorne did not ignore the standard error of measurement in assessing Applicant's IQ scores or refuse, based on his IQ scores, to go on to consider whether he had adaptive deficits. *Moore*, 137 S. Ct. at 1049. While he may not have had the benefit of all of the current evidence of adaptive deficits, Dr. Thorne did not overemphasize Applicant's perceived strengths to the detriment of considering his manifest deficits; nor did Dr. Thorne discount any deficits he perceived in Applicant's adaptive functionality because Applicant was imprisoned. *Id.* at 1050. He did not overtly misidentify certain risk factors for ID as reasons, instead, to conclude that Applicant's adaptive deficits were not "related" to his subaverage intelligence. *Id.* at 1051. Nor did he conclude that Applicant failed to show that any deficits were unrelated to some other

Dr. Thorne has since changed his diagnosis only because, during the interim between Applicant's initial writ proceeding and this one, the manuals have changed. Are we going to re-evaluate and relitigate every capital case involving a claim of ID whenever—typically at ten- or twelve-year intervals—a revised edition of the DSM or AAIDD manual is published? Surely it violates at least the spirit, if not the letter, of Article 11.071, Section 5's abuse-of-the-writ principle to permit this kind of serial litigation—rehashing the *same* issue, over and over—before the State may carry out its otherwise legitimately obtained judgment.

## V.        Conclusion

I respectfully dissent.

**FILED:**                        May 25, 2022
**PUBLISH**

---

co-existing condition or co-morbidity, such as a personality disorder. *Id*. He made no mention of the disowned *Briseno* factors. *See id*. at 1051–52 (rejecting the factors identified by this Court in *Ex parte Briseno*, 135 S.W.3d 1, 8 (Tex. Crim. App. 2004), as "an outlier").